IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Liberty Shipholding, Inc., | § § § | |
| Plaintiff, | § § | CIVIL ACTION 1:21-cv-01265-UNA |
| v. | § § | IN ADMIRALTY, Rule 9(h) |
| Western Bulk Carriers AS, | § § § | |
| Defendant, | § § | |
| and | § § | |
| CEMEX Construction Materials Atlantic, LLC | § § | |
| CEMEX Construction Materials Florida, LLC | § § | |
| CEMEX Construction Materials Houston, LLC | § § | |
| CEMEX Construction Materials Pacific, LLC | § § | |
| CEMEX Construction Materials South, LLC | § § | |
| CEMEX Corp.. | § § | |
| CEMEX Southeast LLC | § § | |
| Nitron Group LLC | § § | |
| Livingston International, Inc. | § § | |
| CSC Sugar, LLC, | § § | |
| Garnishees | § § | |

**VERIFIED COMPLAINT WITH REQUEST FOR ISSUANCE OF
PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT**

Liberty Shipholding, Inc. (formerly Quiana Navigation SA, herein, "Liberty" or

"Owners") brings this action against Western Bulk Carriers AS ("WBC" or "Charterers") *quasi*

*in rem* pursuant to Supplemental Rule B for Certain Admiralty and Maritime Claims, requesting the issue of writs of maritime attachment and garnishment including against Garnishees and states as follows:

### Jurisdiction and Venue

1.      This is an action within this Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333 and is an admiralty or maritime claim within Fed. R. Civ. P. 9(h).  Liberty further brings this action pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1, 8 because it involves a maritime transaction (charter party) and Liberty hereby demands security for arbitration proceedings in London (the "London Arbitration"), pursuant to the charter party terms.

2.      Venue is proper in this District because the Garnishees are within the meaning of Supplemental Rule B located, can be found, and/or can be served with process in this District.

3.      Venue is also proper in this District because Defendant's property is or soon will be in this District.

4.      Defendant cannot be found in this District within the meaning of Supplemental Rule B.

### The Parties

5.      Liberty ("Owners") is a corporation organized under the laws of Marshall Islands and at all times relevant to this action the owner of the M/V CARAVOS LIBERTY (herein, the "Vessel").  Liberty chartered the Vessel to WBC pursuant to a charter party agreement dated February 20, 2020 (the "Charterparty").

6.      WBC ("Charterers") is a corporation organized under the laws of Norway and chartered the Vessel from Liberty.  WBC, as detailed herein, wrongfully has breached the Charterparty and failed or refused to pay Liberty as the Charterparty and related documents require.

7.      Garnishees each are entities with offices or agents located in this District which, on information and belief as detailed below, Liberty reasonably believes hold accounts which are the property of and/or owing to WBC.

## Facts

8.      By the Charterparty, the Owners chartered the Vessel to the Charterers for "1 TCT ALWAYS VIA SPS SBS SAS AA AWIWL/INCL VIA BRAZIL INT SANTOS WITH SUGAR/GRAINS TO BANGLADESH INTENTION CHITTAGONG," at a rate of hire of $12,000 per day pro rata plus a ballast bonus of $200,000.

9.      The terms of the Charterparty were set out in a fixture recap (the "Recap") dated 21 February 2020, which in turn incorporated a previous charterparty dated 25 November 2019 on an amended NYPE form, and included amongst others the following express terms:

a.      "[Recap clause 7] REDEL DLOSP 1 SP PG/BANGLADESH INT CHITTAGONG PICO ATDNSHINC.  [Recap clause 8]. HIRE  12,000 PDPR + 200,000 GBB HIRE PAYABLE 15 DAYS IN ADVANCE… [Recap clause 10] CVE  1,500 PMPR [Recap clause 11] … BOR SHALL ABOUT THE SAME AS ON DELIVERY BUT SAME GRADES. ABOUT MEANING +/- 5%. ANY VLSFO LEFT ON REDELIVERY SHALL BE ACQUIRED BY OWNERS AT  485/MT. …

b.      Clause 31 – Bunker Clause

… Owners to have the option to bunker the vessel at their time, risk and expenses during the currency of this charter party provided same does not interfere with Charterers' operations, including arrival draft, and draft restrictions in loading and discharge ports and bunker intake…

c.      Clause 44 - Cargo Claim

Cargo claims to be settled in accordance with NYPE Interclub Agreement as amended in 1/9/1996 or any later amendments on September, 2011. However, Charterers will not grant any time extension to cargo interests or settle any cargo claim without Owners' prior written consent

    d.      Clause 51

           Charterers have the option to redeliver the vessel with uncleaned holds against a lumpsum payment of 5,000 in lieu of hold cleaning excluding removal of lashing material dunnage and debris.

    e.      Clause 59

           … Vessel not to be ordered to infested areas or to ports where world sanitary organisations have declared contagious diseases.

    f.      Clause 96

           … d) … prior to the Vessel's delivery a joint divers inspection shall be carried out and in case the vessel's underwater parts are found dirty (hull, rudder or propeller found fouled with slime, algae, sea weeds and/or barnacles), then Charterers to arrange for their full cleaning and or polishing at their time and expense. If the vessels underwater parts are found dirty the cost of the underwater inspection shall be borne by Charterers, otherwise shared equally between the parties."

10.      Clause 8 of the Inter-Club Agreement (which was incorporated into the

Charterparty pursuant to clause 44, as set out above) provided as follows:

    "Cargo claims shall be apportioned as follows: …

    (d) All other cargo claims whatsoever (including claims for delay to cargo):

    50% Charterers
    50% Owners

    unless there is clear and irrefutable evidence that the claim arose out of the act or neglect of one or the other (including their servants or sub-contractors) in which case that party shall then bear 100% of the claim."

11.      Further, it was an implied term of the Charterparty that the Charterers would

indemnify the Owners against the consequences of complying with the Charterers' orders,

unless, by the Charterparty, the Owners consented to bear the loss damage or liability in

question.

12.      The Vessel was delivered into service at Santos, Brazil on 1 March 2020 at 17:48

UTC with 105.008 mt low sulfur marine gas oil (LSMGO) and 0 mt very low sulfur fuel oil

(VLSFO) on board.  Charterers supplied 941.031 mt VLSFO to the Vessel at Santos on 12 March 2020.

13.     On 13 March 2020, pursuant to orders given by the Charterers on 24 February 2020, the Vessel loaded a cargo of 55,000 mt of Brazilian Raw Cane Sugar in bulk (the "Cargo"), to be discharged at Chittagong, Bangladesh.

14.     On 29 March 2020 Owners stemmed 599.996mt VLSFO for their own account at Port Elizabeth.  This VLSFO was Owners' bunkers and were not for Charterers' consumption during the Charterparty.

15.     On 21 April 2020, the Owners wrote to the Charterers pointing out that the World Health Organization ("WHO") had reported an increasing number of confirmed cases and deaths in Bangladesh, and as such the Charterers were in breach of clause 59 of the Charterparty by ordering the Vessel to discharge at Chittagong.  The Owners therefore invited the Charterers to provide legitimate orders to proceed to an alternative port as a matter of urgency.

16.     The Vessel arrived at the port of Chittagong and tendered Notice of Readiness ("NOR") at 10:54 local time on 22 April 2020.  Later that day, the Charterers wrote to the Owners denying that they were in breach of clause 59 and insisting that the Vessel discharge at Chittagong.  The email proceeded to threaten to place the Vessel off-hire in the event that the Owners did not comply with the Charterers' orders.

17.     The Owners responded to that email later on 22 April 2020, noting that, as of 21 April 2020, the World Health Organization (WHO) had confirmed 3,382 coronarivus cases in Bangladesh, that the number of new cases was rising daily, and that lockdown measures were in place. In the premises, the Owners reiterated their position that the order to discharge at Chittagong was a breach of clause 59 of the Charterparty, but nevertheless went on to inform the Charterers of various precautionary measures which it required to be implemented if discharge

- 5 -

were to take place at Chittagong to protect the Vessel and its crew from the spread of coronavirus.  The Owners also rejected the Charterers' suggestion that the Vessel was off-hire.

18.     By an email sent at 23:16 on 24 April 2020, the Charterers responded to the Owners' message, inter alia objecting to the precautionary measures the Owners were proposing, saying that there they were not justifed or reasonable. There then followed lengthy correspondence in which the parties sought to agree a procedure by which the Cargo could be safely discharged.  Following the eventual resolution of these issues, discharging commenced at 23:00 on 28 May 2020.

19.     On 23 July 2020, while discharging was still in progress, the Vessel was arrested by the Bangladeshi court in support of a claim which had been brought against the Owners by the receivers of the cargo, Deshbandhu Sugar Mills Ltd, arising out of the delay in discharging the Cargo (the "Receivers").

20.     On 29 July 2020, at about 12:50 local time, discharging was completed.  The following day, at or about 20:43, the Charterers purported to redeliver the Vessel to the Owners. For the avoidance of doubt, however, the Charterers were not entitled to redeliver the Vessel at this time in circumstances where (a) the trip which was the subject of the Charterparty remained incomplete and/or (b) the Vessel had not carried out the joint divers inspection which the Charterers were obliged to arrange prior to her redelivery under clause 96 and/or (c) Charterers had not replenished the vessel with sufficient bunker quantities so as to be redelivered with about the same quantities as on delivery pursuant to the relevant Charterparty provisions. In the circumstances, the Owners rejected the Charterers' purported redelivery notice, as they were entitled to do.

21.     On or about 1 September 2020, the Vessel was released from arrest by the Bangladeshi court following the provision by the Owners of security for the Receivers' claim by

way of a bank guarantee   Following the lifting of the arrest, on 3 September 2020, the Vessel

sailed from Chittagong to Trincomalee, Sri Lanka, to undergo an underwater inspection pursuant

to clause 96 of the Charterparty (poor visibility and underwater currents having prevented these

operations from taking place at Chittagong).  The Charterers were invited to attend the inspection

but declined to do so.  The underwater inspection reported that the Vessel's underwater parts

were dirty, following which the Owners arranged for them to be cleaned. The total cost of the

inspection and cleaning was $14,400.

22.    The Vessel sailed from Trincomalee at 12:18 UTC on 9 September 2020, at which

point the period of the Charterparty came to an end. At the time of redelivery, and as noted in the

Owners' redelivery notice, the Vessel's holds were unclean and there were 3.56 mt LSMGO

and 495.95 mt VLSFO on board.

23.    By reason of the facts and matters stated above, the Charterers were liable to pay

hire under the Charterparty at all material times from the Vessel's delivery into service on 1

March 2020 at 17:48 until the Vessel's redelivery to the Owners at 12:18 on 9 September 2020.

Further or alternatively, if the Vessel was validly redelivered by the Charterers at 15:43 UTC

(20:43 local time) on 30 July 2020, the Owners claim and are entitled to damages for lost hire

and bunkers consumed during the approximately 42 days between 15:43 UTC on 30 July 2020

and 12:18 UTC on 9 September 2020.  In particular:

a.    By ordering the Owners to discharge the Vessel at Chittagong (and/or by

persisting with such order) the Charterers breached clause 59 of the Charterparty and/or

the safe port warranty in clause 6 of the Recap. In particular, at least as at 21 April 2020,

the WHO had declared a contagious disease at the port of Chittagong for the

purposes of clause 59 and/or the port of Chittagong was not a safe port. But for that

breach, the Vessel would not have been arrested by the Receivers and the said time

and/or bunkers would not have been lost.

b.      Further or alternatively, the Charterers are liable for the loss of hire and/or bunkers pursuant to the implied indemnity pleaded at paragraph 3A above. In particular, the said losses were the consequence of the Owners complying with the Charterers' orders to discharge the Vessel at Chittagong, and were not losses which, by the Charterparty, the Owners consented to bear.

c.      During the aforesaid period, the Vessel consumed 2.55mt LSMGO and 183.16mt VLSFO by way of bunkers, at a cost of $625/mt LSMGO and $485/mt VLSFO, for which the Charterers, in the total amount of $90,426.35 are accordingly liable. As for the claim for lost hire, the applicable rate of hire is the prevailing market rate at which the Owners could have chartered the Vessel at or about 30 July 2020, as to which the Owners will adduce expert evidence at the appropriate time but reasonably believe is at least the Charterparty rate of $12,000/day.

24.      Further or alternatively, and again if the Vessel was validly redelivered by the Charterers at 15:43 UTC (20:43 local time) on 30 July 2020, the Charterers are in any event liable for the loss of hire and/or bunkers consumed between 3 September 2020 and 9 September 2020 for breach of clause 96 of the Charterparty, by redelivering the Vessel without a joint divers' inspection having taken place.

25.      Further, the Charterers are liable to pay the Owners the sum of $14,400 in respect of the underwater inspection and cleaning at Trincomalee, pursuant to clause 96 of the Charterparty.

26.      Further, the Charterers are liable to pay the sum of $5,000 to the Owners pursuant to clause 51 of the Charterparty for redelivering the Vessel with unclean holds.

27.     The Vessel was delivered with 0 mt VLSFO on board. Charterers had stemmed 941.031 mt VLSFO at Santos on 12 March 2020. On 29 March 2020 Owners stemmed 599.996mt VLSFO at Port Elizabeth for their own account. The Vessel was redelivered with 495.95 mt VLSFO on board. During the course of the Charterparty the Charterers consumed 104.05 mt VLSFO owned by Owners. The Charterers are liable to indemnify the Owners in respect of their depletion of Owners' bunkers and/or are liable for conversion of Owners' bunkers in the sum of 104.05 mt x $485 = $50,464.25.

28.     On 10 September 2020, the Owners sent the Charterers a final hire statement showing a balance outstanding under the Charterparty of $628,853.71. In breach of the Charterparty, however, the Charterers have failed to pay the said sum to the Owners, or any part of it. The Owners therefore now claim the said sum from the Charterers by way of debt or damages.

29.     Further or alternatively, pursuant to clause 8(d) of the Inter-Club Agreement, the Charterers are liable to indemnify the Owners for 100% of the costs of defending the Receivers' claims against them, together with any other sums which the Owners are required to pay the Receivers in respect of their claim. In particular, as set out above, there is clear and irrefutable evidence that the Receivers' claim arose out of the Charterers' orders to discharge the Vessel in Chittagong, which was a breach of clause 59 of the Charterparty and/or the safe port warranty in clause 6 of the Recap in circumstances where, at least by 21 April 2020, the WHO had declared an infectious disease (*i.e.* coronavirus) at the port of Chittagong. In the alternative, the Owners claim a 50% indemnity under clause 8(d) of the Inter-Club Agreement. The Owners claim a declaration to the above effect, and will further particularize their claim in this regard as and when the relevant costs and liabilities are incurred, but reasonably believe that the costs of defense will amount to at least $250,000.

30.     Further, Owners are under the Charterparty terms and controlling English law due their reasonable attorneys fees and costs arising in connection with the London arbitration, and the fees and costs of the arbitrators, which Owners reasonably believe to be at least $250,000.

### Count I – Breach of Maritime Contract

31.     Liberty incorporates the above paragraphs as if fully set forth herein.

32.     WBC breached its maritime contract with Liberty as set out above.  Despite repeated demand, Liberty remains unpaid.

33.     Liberty therefore demands judgment, as set out more fully below.

### Count II: Maritime Attachment and Garnishment (Rule B)

34.     Liberty incorporates the above paragraphs as if specifically set forth herein.

35.     Liberty seeks issue of process of maritime attachment so that it may obtain payment for the amounts due to it under the Charter.

36.     No security for Liberty's claims has been posted by WBC or anyone acting on its behalf to date.

37.     WBC cannot be found within this District within the meaning of Rule B, but is believed to have, or will have during the pendency of this action, property and/or assets in this jurisdiction consisting of cash, funds, freight, hire, and/or credits in the hands of garnishees in this District, including but not limited to those named Garnishees herein.

### Prayer for Relief

WHEREFORE, Liberty prays:

A.     That in response to Count I, process of maritime attachment be issued to garnish and attach property of WBC in the amount of at least  **$1,970,760.18** itemized as follows:

Final Hire Statement                                    $       628,853.71

| | | |
|---|---|---|
| Pre-award Interest, interest, 5%, Compounded Quarterly, 2 years | $ | 65,706.47 |
| Estimated defense costs, Bangladesh arrest | $ | 250,000.00 |
| Cost of maintaining Bangladesh bank guarantee | $ | 427,700.00 |
| Estimated London Arbitration, Attorneys and Arbitrators' Fees/Costs | $ | 598,500.00 |
| **Total Security Amount:** | **$** | **1,970,760.18** |

in security of Liberty's claims asserted in the Charter arbitration commenced in London, upon that amount being garnished and attached, this action to be stayed and the amount to await final award in arbitration and judgment entered on such award by this Court;

B.      That in response to Count II, since Defendant cannot be found within this District pursuant to Supplemental Rule B, this Court issue an Order directing the Clerk to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of WBC's tangible or intangible property or any other funds held by any garnishee, up to the amount of at least the amount demanded herein to secure Liberty's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Supplemental Rule B, answer the matters alleged in the Verified Complaint;

C.      That as provided in Supplemental Rule B, that such person over 18 years of age be appointed as moved for herein pursuant to Supplemental Rule B and Fed. R. Civ. P. 4(c) to serve process of Maritime Attachment and Garnishment in this action; and

D.      That this Court award Liberty such other and further relief that this Court deems just and proper.

Dated: September 3, 2021.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Timothy Jay Houseal*
Timothy Jay Houseal (Del. Bar ID No. 2880)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6682
thouseal@ycst.com

Liberty Shipholding, Inc. Counsel

**OF COUNSEL**
J. Stephen Simms
Simms Showers LLP
201 International Circle, Ste. 230
Baltimore, Maryland 21030
Telephone:      (410) 783-5795
Facsimile:      (410) 510-1789
jssimms@simmsshowers.com

## **VERIFICATION**

I am a Principal of the law firm Simms Showers LLP, of counsel to Plaintiff.

The facts alleged in the foregoing complaint are true and correct to the best of my knowledge and information based upon the records of Plaintiff made available to me by Plaintiff. Authorized officers of Plaintiff are not readily available in this District to make verifications on Plaintiff's behalf.  I am authorized to make this verification on Plaintiff's behalf.

I further certify that, pursuant to Supplemental Rule B, I caused a search to be made of electronic records and Directory Assistance for addresses and telephone numbers of defendants in this District.  There is no record of any general or resident agent authorized to accept service of process for Defendant in this District.

Pursuant to 28 U.S.C. § 1746(1), I solemnly declare under penalty of perjury that the foregoing is true and correct.

Executed on September 3, 2021.

/s/ J. Stephen Simms
J. Stephen Simms

- 13 -